**Frances HANKINS, Plaintiff–Appellant,**

**v.**

**THE GAP, INC., Defendant–Appellee.**

No. 95–5243.

United States Court of Appeals, Sixth Circuit.

Argued March 19, 1996.

Decided May 29, 1996.

John H. Forg (argued and briefed), Forg & Forg, Cincinnati, OH, for plaintiff-appellant.

Roger A. Weber (argued), Thomas J. Sarakatsannis (briefed), Taft, Stettinius & Hollister, Cincinnati, OH, Robert B. Craig, Taft, Stettinius & Hollister, Crestview Hills, KY, Joanne K. Garrison, The Gap, Inc., San Bruno, CA, for defendant-appellee.

Before LIVELY, MARTIN, and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Plaintiff Frances Hankins appeals from the district court's summary judgment in this action under Title I of the Americans With Disabilities Act, 42 U.S.C. §§ 12111–12117. Hankins argues that her former employer, The Gap, Inc., discriminated against her on the basis of her migraine headaches. The district court, however, determined that she was not a "qualified individual with a disability." We affirm, because Hankins failed to take advantage of reasonable accommodations provided by The Gap. In addition, we affirm the district court's dismissal of Hankins's pendent state law claims.

## I. BACKGROUND

Hankins was an at-will employee of The Gap from December 1980 to December 1992. During most of this period, she worked in the company's distribution center as a merchan-

dise handler, or "picker," pulling items from the warehouse stock and placing them in containers for shipment to The Gap's various retail stores. Items were picked according to a "picking ticket," which listed the specific articles of clothing required for each store. As both parties acknowledge, accuracy and productivity in filling these orders were the most important requirements for performing the job.

To ensure accuracy, The Gap periodically checked a random sample of each picker's work. If a picker's error rate exceeded 1.25% for any given four-week period, the employee was given a warning, under a progressive discipline system. The first stage of this system was a verbal warning. If an employee's four-week error rate exceeded 1.25% within three months of receiving a verbal warning, he or she would then be given a written warning. If the employee again exceeded 1.25% within three months of a written warning, the employee received a final warning. A further incident of inaccuracy within three months of a final warning meant termination for the employee. This is what happened to Hankins in 1992. Although in prior years she had received verbal and written warnings, she had been able to bring her four-week error percentage under 1.25% before receiving a final warning. In 1992, however, she received a verbal warning on May 13, a written warning on August 5, and a final warning on September 28. On December 8, her last day of work, Hankins was again found to have exceeded the maximum allowable rate, with a four-week error calculation of 3.11%. She was told that she was going to be fired. According to The Gap, Hankins's error rate for the *entire year* was 1.48%. By contrast, the average rate in 1992 for all pickers was 0.58%.

Hankins claims that her inaccurate picking was attributable to headaches that she had suffered since 1988. It was only at the end of March 1992, however, that she learned these were migraine headaches. She states that she then informed her supervisors of her disability and repeatedly requested that she be transferred to another area of the warehouse, either "Pikpak" (also called "Pick–Pack") or "Shoes," which she perceived to be less stressful than her customary area and thus less likely to induce migraines. Although her supervisors had periodically transferred her and other employees to "Pikpak" on a temporary basis in the past, they allegedly refused to transfer her on many of the occasions she requested after March 1992. As a result, she claims, The Gap failed to provide reasonable accommodation for her disability. The Gap, on the other hand, denies that Hankins ever informed the company of her condition, noting that there is no written record of migraines in any of her personnel files. Moreover, it points out that other employees of The Gap who suffered from migraines were more than adequately accommodated by the company's leave and medical policies, which were also available to Hankins.

On December 8, 1992, the date she failed the final stage of the progressive discipline process, Hankins claims to have suffered another severe headache. Although she was not fired on the spot, she was informed that her termination the following week was inevitable. Her supervisor also supposedly told her that she could go home early, take the rest of the week off, and simply wait for the notice of termination. Instead, she decided to continue working that day. The following day, Hankins did not report to work; on December 10, before she was officially fired, she submitted a request for a one-month disability leave, attaching a recommendation from her physician. After some consideration, The Gap decided to grant her leave, but the company stated that she would be terminated upon expiration of the leave. During leave, Hankins was able to draw disability pay and health insurance. She then successfully obtained extensions of this leave, first for "temporary" total disability, and then "permanent" total disability. This lasted until February 1994, when The Gap finally informed her that all leave privileges had expired and that she was officially terminated. By this time, Hankins had already filed suit against The Gap in federal court.

Hankins brought her action under both the Americans With Disabilities Act (ADA) and Kentucky state law. After discovery was completed, the district court granted The

Gap's motion for summary judgment, holding that Hankins was not "an otherwise qualified individual with a disability." Opinion and Order, No. 93–172, at 4–9 (E.D.Ky. Jan. 10, 1995). In addition, the district court found that plaintiff had failed to make a prima facie case of discrimination based on disparity of treatment. Having dismissed plaintiff's federal claims, the district court dismissed her state law claims without prejudice. Hankins timely filed a notice of appeal.

## II. REASONABLE ACCOMMODATION UNDER THE AMERICANS WITH DISABILITIES ACT

■ A district court's grant of summary judgment is reviewed de novo. *City Management Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 250 (6th Cir.1994). Considering all facts and inferences drawn therefrom in the light most favorable to the appellant, *id.*, we reverse the judgment only upon a showing of the existence of a genuine issue of material fact, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In this case, we are faced with a claim under Title I of the ADA, which prohibits unwarranted discrimination against disabled persons in employment. *See* 42 U.S.C. § 12112(a). The key term, "discriminate," is defined in section 12112(b) as including several acts, of which the most relevant to this litigation is:

> (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]

A "qualified individual with a disability," in turn, is an individual who, with reasonable accommodation, "can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Reasonable accommodation" thus lies at the heart of this case, as in most ADA cases. It is given further definition in 42 U.S.C. § 12111(9):

> The term "reasonable accommodation" may include—
>
> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

■ Hankins argues that The Gap's refusal to transfer her to "Pikpak" or "Shoes," once it became aware of her disability, was a failure to provide reasonable accommodation. The Gap responds that neither "Pikpak" nor "Shoes" would have been a reasonable accommodation because (1) "Pikpak" was located in a hotter, brighter, busier, and noisier area than Hankins's customary assignment and was unsuitable for anyone suffering from migraines, (2) "Pikpak" operated at most once or twice a week, and even less often during the shift Hankins wanted to work, and (3) "Shoes" required even greater accuracy than Hankins's customary area, such that the probability of inaccurate picking by Hankins precluded her from working in "Shoes." Hankins does not dispute any of these points, and thus The Gap's contention that "Pikpak" and "Shoes" were not reasonable accommodation is actually quite persuasive. In reality, however, it does not matter whether "Pikpak" or "Shoes" would have been a reasonable accommodation, so long as The Gap made available other reasonable and effective accommodations to Hankins. The Appendix to the ADA regulations explains that "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." 29 C.F.R. pt. 1630, app. at 415. As the Supreme Court has held in analogous circumstances, an employee cannot make his employer provide a specific accommodation if another reasonable accommoda-

tion is instead provided. *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68–69, 107 S.Ct. 367, 371–72, 93 L.Ed.2d 305 (1986). Although an employee is not required to accept an offered accommodation, "if such individual rejects a reasonable accommodation ... that is necessary to enable the individual to perform the essential functions of the position ... the individual will not be considered a qualified individual with a disability." 29 C.F.R. § 1630.9(d).

■ *Philbrook* was an employment discrimination case under Title VII of the Civil Rights Act of 1964, but we believe that its reasoning regarding alternate reasonable accommodations is fully applicable to actions under Title I of the ADA. In the instant case, The Gap did provide alternate reasonable accommodations to Hankins, mainly in the form of leave time. As The Gap points out, Hankins had available to her paid sick leave, paid personal days, a voluntary time off program, and ample and flexible vacation time, all of which she left virtually untouched. In addition, Hankins could have received treatment for her migraines—including resting time—at the company medical center, which she never attempted to receive. The EEOC specifically mentions the use of paid and unpaid leave as a potential form of reasonable accommodation, *see* 29 C.F.R. pt. 1630, app. at 407, and Hankins does not disagree that the use of leave was a possible accommodation. On appeal, however, Hankins tries to argue that the company never adequately "notified" her of these possibilities. Even if this contention were true, it should nonetheless have been self-evident to Hankins that going to the medical center or asking for time off is what she needed to do when a migraine occurred. The most logical way for Hankins to have removed herself from the company's progressive discipline track would have been to stop working whenever she felt "extremely disoriented" by her headaches or medication. She states that she "would have difficulty reading [her] 'picking ticket'" during her headaches and "was prone to making even more mistakes." Hankins Aff. ¶ 9. She argues that the errors which led to her warnings were directly attributable to the headaches and to her required medication. Given the direct correla-

tion between her migraine headaches and her warnings for inaccuracy, it was entirely unreasonable for her to attempt to work during these headaches and thereby commit further errors.

We note that plaintiff's argument that her supervisors never suggested she take time off is contradicted by one of her own supporting affidavits. Her daughter, Shirley Bittner, states, "From time to time during this period, either Kloska or Fox would ask me or my sister to take my mother home early from work because of the onset of a severe headache." Bittner Aff. ¶ 7. As Bittner explains, "Because she needed to work and could not afford to take any more time off, my mother tried to work through these headaches whenever she could." *Id.* ¶ 6. Hankins's own insistence on working when she had a migraine headache thus seems to belie the claim that she would have taken advantage of provided accommodations if only she had been explicitly informed of their existence.

■ At any rate, whether or not her supervisors recommended that she stop working during her headaches is not dispositive, because such actions would only have belabored the obvious. While it is true that an employer should normally advise an employee of available accommodations once the employee informs the employer that an accommodation is needed, it is equally true that an employer has no duty to reiterate self-evident options to an employee when she is clearly already aware of them. In this case, there is a genuine dispute over whether Hankins actually notified The Gap about her migraines and requested a transfer to "Pikpak" or "Shoes," but there is certainly no dispute over whether she knew about accommodations that already existed. She admits she knew about the availability of paid and unpaid medical leave, voluntary time off, personal days, and vacation days, as she had occasionally taken such leave in the past. Hankins also knew about the availability of the company medical center because she went there 29 times over the course of her employment. None of these visits was for a migraine headache, however. Hankins does

not contest The Gap's assertion that other migraine-afflicted employees were adequately accommodated through these programs and services. Hankins does not claim that any application for leave was ever denied to her. Finally, Hankins admits that she never paid any attention to The Gap's posted notices regarding her rights under the ADA. Given the apparentness of available accommodations, plaintiff's contention that she needed to be told explicitly about them is singularly unconvincing.

In summary, we hold that plaintiff's refusal to accept available reasonable accommodations precludes her from arguing that other accommodations should also have been provided. Although Hankins maintains that the district court committed a fundamental error when it found she was not a "qualified individual with a disability," in reality, the district court was only following the ADA regulations with admirable precision. As noted earlier, § 1630.9(d) clearly states that a claimant "will not be considered a qualified individual with a disability" if she rejects reasonable accommodations that are necessary for her to perform the "essential functions" of her position. 29 C.F.R. § 1630.9(d). Hankins effectively rejected the obvious reasonable accommodations provided by The Gap, proposed other, more dubious accommodations instead, and was thus rendered incapable of maintaining accuracy, an essential function of the merchandise handler's job. In other words, Hankins's § 12112(b)(5)(A) claim was properly decided by the district court, because it presented the quintessential case of an individual not "qualified" under 29 C.F.R. § 1630.9(d).

### III. DISPARATE TREATMENT

■ Hankins next raises an argument based on 42 U.S.C. § 12112(b)(1). Section 12112(b)(1) sets forth an additional example of "discrimination" under the ADA, not related to providing reasonable accommodation: "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." In Hankins's view, The Gap violated this provision

by "favoring" certain employees, allowing them to transfer to "Pikpak" after receiving a warning for inaccuracy, while refusing to allow her to do the same. As the district court correctly found, however, Hankins did not present a prima facie case of disparate treatment. The only evidence Hankins produced to support her argument was that one employee was once transferred to "Pikpak" after receiving a written warning. Aside from the fact that this employee did not have migraine headaches, however, Hankins brought forward no evidence to show that she was treated less favorably than other employees because of her migraines. Indeed, Hankins failed to show she was treated any less favorably at all. She admits that she herself was occasionally transferred to "Pikpak" after receiving both verbal and written warnings. As a result, the fact that another employee also experienced the same temporary transfer on a single occasion is hardly sufficient evidence of anything. Hankins plainly has not presented a prima facie case under § 12112(b)(1).

### IV. PENDENT STATE LAW CLAIMS

■ Hankins finally argues that the court abused its discretion when it dismissed her pendent state law claims. Hankins is correct that abuse of discretion is the relevant standard of review. See *Landefeld v. Marion Gen. Hosp., Inc.,* 994 F.2d 1178, 1182 (6th Cir.1993). Hankins is incorrect, however, that any such abuse can be found here.

■ The supplemental jurisdiction statute, 28 U.S.C. § 1367, explicitly allows district courts to dismiss pendent state law claims if all federal claims have been dismissed:

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

. . .

(3) the district court has dismissed all claims over which it has original jurisdiction. . . .

This court has further instructed district courts, before deciding whether to retain jurisdiction over the state claims, to "consider the interests of judicial economy and the avoidance of multiplicity of litigation and bal-

ance those interests against needlessly deciding state law issues." *Landefeld*, 994 F.2d at 1182. In addition, this court has stated that "generally, 'if the federal claims are dismissed before trial ... the state claims should be dismissed as well.'" *Id.* (citing *Taylor v. First of America Bank–Wayne*, 973 F.2d 1284, 1287 (6th Cir.1992)). Under these guiding principles, Hankins is unable to prevail. She fails to show how any substantial savings in judicial resources would be gained that outweigh the interest in avoiding the unnecessary resolution of state law issues. She points to no undue amount of wasted or duplicative effort that will result from having to re-file her claims in state court. Discovery has been completed in this case, and there is no reason to think that any additional discovery will be necessary should she refile her state claims in state court. In sum, Hankins has not shown an abuse of discretion.

The summary judgment is **AFFIRMED.**