**Crystal M. SMITH, Plaintiff–Appellant,**

v.

**HONDA OF AMERICA MAN-UFACTURING, INC., De-fendant–Appellee.**

**No. 02–3007.**

United States Court of Appeals, Sixth Circuit.

May 24, 2004.

Merl H. Wayman, John S. Marshall, Joshua J. Morrow, Columbus, OH, for Plaintiff–Appellant.

Mary Ellen Fairfield, James A. Wilson, Gary J. Saalman, Vorys, Sater, Seymour & Pease, Columbus, OH, for Defendant–Appellee.

Before: BOGGS, Chief Judge; DAUGHTREY, Circuit Judge; and OBERDORFER, Senior District Judge.*

PER CURIAM.

Plaintiff Crystal M. Smith appeals the district court's grant of summary judgment in her Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, action against her employer, Honda of America Manufacturing, Inc. ("Honda"). Smith, a production worker for Honda, developed breathing problems while working in Honda's paint department. Honda transferred her to a production position in the assembly department, but Smith claimed that the transfer did not alleviate her breathing problems. Smith then asked to be transferred to an office position, but Honda declined because the company considered her unqualified for the positions for which she applied. The district court found that there was a genuine issue of material fact whether Smith was disabled under the ADA, but concluded that Smith was unqualified for any of the office positions, and therefore granted summary judgment to Honda. We affirm on alternative grounds.

---

* The Honorable Louis F. Oberdorfer, Senior United States District Judge for the District of Columbia, sitting by designation.

## I

Since 1990, Smith has been employed at Honda's plant in East Liberty, Ohio. Initially, Smith worked in the assembly department. In 1994, after receiving discipline for bringing a loaded gun to work, she was transferred to the welding department. In June 1997, after receiving discipline for verbally abusing another worker and creating a hostile work environment at that department, she was transferred to the paint department. After working for two months in that department, where her duties included spraying the undersides of cars with anti-rust coatings, Smith went on pregnancy leave.

On April 16, 1998, when she returned to work, Smith began experiencing difficulty breathing. As a consequence, she was placed on approved medical leave for the remainder of the month. On April 27, she consulted her family physician, who recommended that she avoid the airborne chemicals Honda used in rust-proofing. On May 5, Smith returned to work and was assigned to the assembly department. However, Smith still experienced the same symptoms and was again placed on medical leave. On May 13, she again returned to work at yet another work station. On June 8, Smith consulted Dr. Joseph H. Cunningham, a pulmonary specialist, who found her to be asymptomatic. During this visit. Smith told Cunningham that she did not experience difficulty breathing at her latest work station. Nevertheless, over the following three months, Smith was frequently placed on medical leave for breathing problems and consulted several other specialists. In late October, she saw Dr. Lawrence Lynne, also a pulmonary specialist. Dr. Lynne recommended that Smith avoid exposure to high concentrations of isocyanates, airborne irritants, and other sensitizing agents. He also asked Smith to keep a diary recording her daily peak flow, a measurement of the volume of air a patient can exhale in one forceful breath. At Smith's next visit with Dr. Lynne, on December 15, he concluded that the peak flows reported by Smith were within the normal range, but repeated his earlier recommendation.

On January 6, 1999, Honda assembled a team of specialists to evaluate where Smith could work, based on Dr. Lynne's recommendations. This team consisted of a medical doctor specializing in occupational health, a registered nurse, an environmental engineer, and a occupational placement specialist. The team collected the plant's historical data on the specified airborne contaminants, including isocyanates, over the past decade. In March 1999, the team recommended that Smith return to her most recent position in the assembly department, based on data showing that it had the lowest concentration of the specified airborne contaminants. While no contemporaneous measurements of airborne contaminant concentration were taken, Honda took air samples at that work station in April 2001 for this litigation and found no detectable levels of isocyanates. At the recommendation of Smith's primary-care physician, Dr. John Ratliff, Smith received permission to return to work gradually over six weeks until she would again work a full eight-hour shift.

On April 5, 1999, Smith began returning to work and reported experiencing sinus problems. Honda's medical department measured Smith's peak flow at the beginning of her shift to be within the normal range and, at the end of her four-hour shift, still within the normal range, but slightly improved. On April 6, Smith went to work again on the same schedule. On April 7 through 12, Smith, at the recommendation of Dr. Ratliff, did not go to work. On April 13, she returned to work and filled out an incident report with Hon-

da's medical department. On June 3, Honda contacted Dr. Ratliff, seeking his advice and offering him a tour of the plant to help find a better work station for Smith. On June 29, Smith requested for the first time that Honda assign her to an office position. On July 13, Dr. Ratliff, whose practice was over a hundred miles from the plant, declined the tour but, at Smith's request, also recommended that she be given an office position in the Material Services Department. Dr. Ratliff later testified at deposition that he had no expertise or knowledge about Honda's physical plant that would have enabled him to recommend any particular placement for Smith, did not have the expertise to evaluate the plant even had he toured it, and did not know what the Material Services Department did. On July 19, Honda responded that, according to their expert team, even an office position in the Material Services Department would involve frequent presence in all the production departments and therefore would have a higher exposure to isocyanates and other airborne irritants than Smith's current position. Honda requested that Dr. Ratliff clarify his recommendation and state the maximum amounts of the various irritants that Smith could tolerate. On August 31, Dr. Ratliff replied that he was unable to give such thresholds and advised simply that she not be placed in an environment that would exacerbate her condition.

On December 15, 1999, Smith returned to her most recent work station in the assembly department. On February 5, 2000, Smith filed another incident report with the Honda medical department, claiming respiratory problems since her return to work. On February 25, she again requested reassignment to an office position. Honda again expressed concerns that, because most office positions also require frequent visits to the production areas, transferring Smith to such a position would likely result in an increased exposure compared to her current low-contamination production position and offered Smith another medical leave. On March 10, Honda informed Smith that she could apply for an office position through Honda's Career Interest Application process. Honda also invited Smith to participate in its new electronic Job Posting system, which came into service just a week before. Under that system, Honda would post vacancies on its internal web site and interested employees would reply with resumes. For the first ten days of a posting, Honda would give a preference to employees seeking a transfer. Smith used the system to apply for six of the forty posted office positions. However, Honda rejected her for all six positions. Honda concluded that Smith, whose resume showed less than a year of experience at office work, more than a decade earlier, and who lacked strong computer skills, did not meet the requirements of any of the positions. In any case, Honda awarded all positions to other applicants with stronger credentials. Later, during discovery, another fourteen open office positions, for which Smith believed she was qualified but which had not been entered in the Job Posting system, were found. On August 27, 2001, Smith returned to her position in the assembly department. As of the time appellate briefs in this case were filed, she continued working in that position.

On October 12, 1999, Smith filed a complaint against Honda in the United States District Court for the Southern District of Ohio. In it, she alleged that she was disabled within the meaning of the ADA and that Honda had denied her a reasonable accommodation of her disability, in violation of the ADA. On December 5, 2001, the district court granted Honda's motion for summary judgment. The court concluded that there was a genuine issue of material

fact regarding whether Smith's breathing impairment rose to the level of a disability. The court also concluded, however, that because Smith was not qualified for any of the positions for which she applied, she was not denied a reasonable accommodation by Honda, rendering summary judgment appropriate. Smith's timely appeal of that grant is now before this court.

## II

We first note that we do have jurisdiction to consider the issues of whether Smith was disabled and whether Smith was offered a reasonable accommodation. To support the contrary conclusion, Smith cites Fed. R.App. P. 4(a)(3): "[i]f one party timely files a notice of appeal, any other party may file a notice of appeal." In this case, Honda did not file a notice of cross-appeal, from which Smith deduces that Honda cannot challenge, and we are bound to affirm, any issue decided by the district court not challenged by Smith and ignore any issue not considered by the district court. This deduction is incorrect. "A decision below must be affirmed if correct for any reason, including a reason not considered by the lower court." *Russ' Kwik Car Wash v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir.1985) (citing *J.E. Riley Investment Co. v. Comm'r*, 311 U.S. 55, 59, 61 S.Ct. 95, 85 L.Ed. 36 (1940)). Moreover, this court retains the power to decide cases on grounds never raised by either party, either at trial or on appeal. *Zhislin v. Reno*, 195 F.3d 810, 813 n. 1 (6th Cir.1999)

Another preliminary objection must also be rejected. Amicus Curiae National Employment Lawyers Association ("NELA") argues that, under *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the district court in granting summary judgment to Honda was obliged to

ignore all evidence presented by Honda. However, this interpretation of the summary judgment standard over-reads *Reeves*. In *Reeves*, the Supreme Court held that trial courts considering summary judgment "should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, *at least* to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (emphasis added, quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2529 at 300 (2d ed.1995)). In fact, *Reeves*-read in the context of the authority cited by the Supreme Court and other unchallenged Supreme Court precedents-does not require the exclusion of all interested party testimony. At summary judgment, the judge may consider all "evidence [favorable to the movant] that the jury is required to believe." Wright & Miller, *supra*, § 2529, at 299. Such evidence includes "uncontradicted and unimpeached evidence from disinterested witnesses," but under some circumstances even the testimony of an "interested witness ... must be believed." Wright & Miller, *supra*, § 2527, at 287–88. In particular, "[t]he testimony of an employee of the [movant] must be taken as true when it disclosed no lack of candor, the witness was not impeached, his credibility was not questioned, and the accuracy of his testimony was not controverted by evidence, although if it were inaccurate it readily could have been shown to be so." Wright & Miller, *supra*, § 2527, at 287 n. 9 (citing *Chesapeake & Ohio R.R. v. Martin*, 283 U.S. 209, 216, 51 S.Ct. 453, 75 L.Ed. 983 (1931)). Even the testimony of the moving party that "is not contradicted by direct evidence, nor by any legitimate inferences from the evidence, and ... is not opposed to the probabilities, nor, in its nature, surprising or suspicious, [need not

be] den[ied] conclusiveness." *Chesapeake & Ohio R.R.*, 283 U.S. at 218. Moreover, if NELA were correct, there could be no summary judgment for a defendant after a plaintiff made a prima facie case, as the defendant's proffered non-discriminatory reason must by necessity be provided by defendant's witnesses. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994); *see also Reeves*, 530 U.S. at 148–49 (contemplating that at least some evidence provided by the employer may be considered on summary judgment).

## III

█ Honda raises significant arguments that Smith was not disabled at all within the meaning of the ADA and that, as the district court held, she was not qualified for the office positions she sought. However, even if we assume that Smith was disabled, we need not reach the issue of her qualifications, because Honda fulfilled its duty of reasonable accommodation without offering her an office position.

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(B). Potential reasonable accommodations include "job restructuring, part-time or modified work schedules, *reassignment to a vacant position,* acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B) (emphasis added).

The disabled employee bears the burden of proposing an accommodation and showing that it is objectively reasonable. *See Monette v. Elec. Data Sys.*, 90 F.3d 1173, 1183 (6th Cir.1996). Where there is more than one reasonable accommodation, the choice of accommodation is the employer's. "[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir.1996) (quoting 29 C.F.R. pt. 1630). "An employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided." *Id.* at 800–01. An employee who declines an offered reasonable accommodation forfeits the status as a "qualified individual with a disability." *Id.* at 801.

Honda discharged its obligation to provide a reasonable accommodation by transferring Smith to a production position where she undisputedly would not be exposed to undue amounts of airborne contaminants. Smith counters that the accommodation was unsuccessful. But there is strong evidence on Honda's side of the question, most strikingly, that Smith eventually did return to the offered position and apparently continues to work there. Smith, in her briefs, offers no explanation of this fact. Nor is there anything in the record to suggest that in the interim Honda took any measures to render the position, which was intolerable in 1999, acceptable in 2001. To the contrary, measurements both before and after Smith rejected the position found no de-

tectable levels of isocyanates, and showed that Smith's work station had the production area's lowest levels of other airborne contaminants. Smith's objective medical tests undertaken while she was at this position indicate that she suffered no impairment there.

Nevertheless, the accommodation was indeed unsuccessful in one sense: it did not cure Smith. She continued to suffer from respiratory trouble even at her new position. But the ADA does not demand the impossible or the pointless, and there is simply no evidence showing either that her continuing problems were caused by continued exposure to irritants at her new job posting, or that transfer to a desk job within Honda's facility would have helped her. The undisputed evidence indicates precisely the opposite.

The facts in this case are remarkably similar to those in *Cassidy v. Detroit Edison Co.,* 138 F.3d 629 (6th Cir.1998). Cassidy, while working for Detroit Edison, began developing breathing problems. *Id.* at 631. Her employer attempted to accommodate this disability "by initially transferring Plaintiff to the computer department after her first asthmatic attack; allowing Plaintiff to work straight [day shifts]; scheduling cleaning and maintenance to occur when Plaintiff was gone; allowing Plaintiff to leave when she may be exposed to allergens; allowed Plaintiff to use her prescribed breathing apparatus at work; allowing Plaintiff to use paid and unpaid leave, and testing Plaintiff's work area." *Id.* at 634–35. When all of these attempted accommodations failed, Cassidy at her physician's recommendation requested "transfers to a vacant position in a well-ventilated and allergen-free workstation that would not 'trigger asthma or cause a drop in peak flow.'" *Id.* at 635. We held that summary judgment was properly granted to the employer, because

it had attempted to provide a reasonable accommodation and Cassidy's final request was too vague to identify a specific position to which her employer could have transferred her and it was unclear whether such a position even existed. *Ibid.* Although Cassidy had several times applied for transfers to vacant positions, the denial of these transfers did not constitute a failure to accommodate because Cassidy did not raise any genuine issue that these positions would have fulfilled her medical restrictions. *Ibid.*

Smith, too, developed breathing problems while at work. Honda, too, transferred her and went to great lengths to ensure that the transfer and other measures would accommodate her medical restrictions, by not exposing her to isocyanates or other airborne irritants. When these efforts failed to end the problem, Smith demanded a transfer to an office position in the Material Services Department, and later to other office positions. Fatal to Smith's case, is the fact that nothing but Smith's bare, inexpert assertion leads to the conclusion that these requested transfers would have accommodated her medical restriction. Honda's opposite conclusion is supported by evidence that these positions would have exposed Smith to more airborne contaminants than the position Honda had already given her. Therefore, Smith, as did Cassidy, has failed to create a genuine issue as to whether Honda denied her a reasonable accommodation for her alleged disability.

## IV

Even if Smith was disabled with the meaning of the ADA, Honda discharged its duty of reasonable accommodation by placing her in a working environment that conformed to her medical restrictions. Honda did not have a further duty to transfer her to a position that would have

been no better for her condition and probably worse. We therefore **AFFIRM** the judgment of the district court.