NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0272n.06
Filed: May 16, 2008

No. 07-3825

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

DIANE BENAUGH,

    Plaintiff-Appellee,

      v.

OHIO CIVIL RIGHTS COMMISSION,

    Defendant-Appellant.

On Appeal from the United States District Court for the Southern District of Ohio at Cincinnati

_____/

**Before:**    **GUY, SUHRHEINRICH, and GIBBONS, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**    Plaintiff Diane Benaugh prevailed at trial against the defendant Ohio Civil Rights Commission (OCRC) on her claim of employment discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 794. The jury awarded plaintiff $58,309 in lost wages and benefits, and $10,000 in other compensatory damages. The case comes before us on the OCRC's appeal from the denial of its motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), or in the alternative for new trial or remittitur under Fed. R. Civ. P. 59. After review of the record and the applicable law, we affirm the judgment in favor of plaintiff.

## I.

    Plaintiff Diane Benaugh was employed as a senior investigator for the OCRC from

1996 through October 2003, and was responsible for handling the agency's most complex and sensitive discrimination cases. Plaintiff drafted charges, interviewed witnesses, met with employers, and made determinations regarding claims of discrimination on behalf of the OCRC. By all accounts, Benaugh did her job well, received good performance reviews, and was among the most productive investigators at the OCRC.

Benaugh was diagnosed with asthma in 1974 and sarcoidosis in 1996, both of which caused shortness of breath and difficulty breathing. Sarcoidosis was described by Dr. Baughman, plaintiff's treating physician, as an inflammatory process that leaves scar tissue or fibrosis in the lungs. Plaintiff's asthma was triggered by extreme changes in temperature, in particular cold air. Dr. Baughman testified that a change of 10 or 15 degrees generally may be sufficient to trigger an asthma attack. Both conditions were treated over time with many of the same medications—including oral medication, inhaled medications, bursts of Prednisone, and antibiotics.

Plaintiff was part of the OCRC's Cincinnati Regional Office, which was located in a building that had interior offices and exterior offices. Only the exterior offices had windows that opened and individual heating and cooling units like one that might be found in a hotel room. Plaintiff worked for the first 3 ½ years in an interior office, until another employee's retirement allowed plaintiff to move into an exterior office in May or June 2000. In December 2000, however, management decided to move OCRC employees closer to their supervisors, and plaintiff was assigned to one of the smallest interior offices. Plaintiff had experienced a worsening of her sarcoidosis during 2000, and requested that she be allowed

to stay in an exterior office. Dr. Baughman provided a note stating that plaintiff needed "climate control" because "changes in temperature can cause exacerbation of her sarcoidosis." The request was denied by an EEO officer, who recommended that she be provided a space heater instead.

Plaintiff took and used a space heater starting in December 2000, and ran it year-round because there was no heat in her office in winter and the air-conditioning ran full blast in summer. Because using the space heater would blow some of the electrical fuses, plaintiff had to place it on a table directly behind her. Plaintiff's sarcoidosis worsened, except during a four-month trial of a medication called Remicade between February and June 2002. Although her lung capacity improved with Remicade, she could not continue that treatment because the cost was prohibitive and was not covered by insurance. After that treatment ended, Benaugh experienced more shortness of breath and was more susceptible to respiratory infections.

After a severe asthma attack in July 2002, plaintiff asked to be moved to an office with a climate control unit. Plaintiff asked the new regional director, Jean McEntire, to be moved to an exterior office in August 2002 and again in November 2002. Both times, McEntire said she would "look into it." Plaintiff continued to experience breathing problems, and discussed her use of the space heater with Dr. Baughman in December 2002. Although Dr. Baughman believed plaintiff to be permanently disabled at that time, he supported plaintiff's decision to continue working. Plaintiff explained that she loved her job and needed the income to support herself and her three daughters. Dr. Baughman advised

plaintiff and the OCRC that she should stop using the space heater to avoid dry air, and needed to avoid extremes of hot and cold temperatures.

In January 2003, plaintiff returned the space heater to her supervisor, along with Dr. Baughman's note, and waited for other accommodation. She continued to work in her office, which had no heat. She wore her coat, hat, and gloves, and put a blanket on her lap. McEntire acknowledged knowing that plaintiff was cold, but denied knowing that the cold affected her medical condition. An exchange of emails on January 6, 2003, however, suggests that McEntire was aware that plaintiff was requesting a climate controlled office as an accommodation. In those emails, plaintiff's coworker, Sharon Griffin, advised McEntire that she was willing to move to make her exterior office available to plaintiff. McEntire's response to Griffin was that no final decision had been made about switching offices around, that other possible offices were being considered, and that she should not dismantle her office yet.

Hearing nothing more, plaintiff filed an EEOC charge in February 2003, complaining that the OCRC failed to reasonably accommodate her disability while at least one climate controlled office remained vacant. One exterior office, referred to as the "plant" office, remained vacant throughout all the relevant time periods and was used by a coworker to store and grow houseplants. Later in 2003, one or more other exterior offices were also left vacant.

At a meeting in March 2003, called to counsel plaintiff about a pattern of absenteeism, plaintiff was asked about the EEOC charge. Plaintiff said she wanted to be moved to an

office where she would not be freezing all day, and McEntire again said she would look into it. Also present at the meeting were Norman Gibson, plaintiff's direct supervisor, and Diane Gaither-Thompson, the chief supervisor.

In May 2003, McEntire proposed a change of offices to plaintiff. Specifically, plaintiff would move back into the exterior office she had previously occupied, and Betty Roberson would move from that office to an empty exterior office near McEntire. Plaintiff's immediate response was to question whether the climate control unit needed to be cleaned first, which McEntire reported to others as a rejection of the accommodation. Within a few days of this offer, plaintiff was taken from work to the hospital with a severe asthma attack. When plaintiff returned, McEntire sent an email asking plaintiff to "confirm the status of [her] acceptance of the office space"; acknowledging plaintiff's concern that the temperature control unit may be moldy; and indicating that McEntire would have maintenance clean the unit. McEntire asked to be informed of plaintiff's decision that day.

Plaintiff sent an email in response, dated May 29, 2003, suggesting that she should move into the vacant office instead of Roberson because the climate control unit had been used less and might have fewer pollutants; questioning whether the maintenance personnel were competent to properly clean the unit in Roberson's office; and asking to be informed of what cleaning products were to be used. Plaintiff also said she would need to confer with legal counsel before reaching a final decision, but testified at trial that this last remark was simply "bluffing." McEntire forwarded this response to others in management, commenting: "It never ends!" Although there is evidence that McEntire inquired and determined that

maintenance could clean the unit, no information about that was communicated to plaintiff at any time before plaintiff went on disability.

Plaintiff was counseled in June 2003 about same-day leave requests and getting doctors' notes for sick leave, but she explained that she did not know in advance when she would be sick at work. In July 2003, plaintiff discussed her request for accommodation with Gibson and was told that management was still working on it. Although unsolicited, plaintiff sent documentation of her disability to several OCRC managers in August 2003 because that information had not been requested from her medical providers. Plaintiff experienced more frequent asthma attacks and respiratory infections. She brought her nebulizer to work to take treatments back-to-back when she had difficulty breathing or had coughing fits. Plaintiff did her work around her treatments, would reschedule telephone interviews when she was not feeling well, and made as few trips as possible to the printer because she would have to stop and lean against the wall to catch her breath. Even so, plaintiff was among the investigators with the highest productivity in the last quarter she worked.

Plaintiff thought she might finally be moving offices in September 2003, after she learned from Roberson that the climate control unit in her office had been replaced. When nothing was said about it, and after a second emergency room visit that month, plaintiff decided that she could not work another season in her unheated interior office. She did not want to stop working, and testified that she believed, having worked the previous nine months in her cold office, that she could have worked at least another year with reasonable accommodation.

In an email dated September 29, 2003, plaintiff confirmed that she was temporarily ceasing performance of her job "due to respiratory disabilities, i.e., Sarcoidosis and Asthma." She also indicated that she had forwarded an initial application for disability to personnel that day, and that additional disability applications would follow. Plaintiff's last day of work was October 3, 2003, and she was approved for disability retirement benefits at 40% of her salary in January 2004. The loss of income was difficult, and plaintiff's house went into foreclosure.

This action, filed in May 2004, asserted claims for disability discrimination, retaliation, and violations of state law. The OCRC's motion for summary judgment was granted in part and denied in part, and the case was referred to a magistrate judge for trial on the disability discrimination claim, only. Trial was conducted over five days in October 2006, and the jury returned its verdict in favor of plaintiff in the amount of $58,309 in lost wages and benefits—an amount stipulated to be the value of plaintiff's salary and benefits for one year—plus an additional $10,000 in other compensatory damages. The magistrate judge denied the OCRC's post-trial motion for judgment as a matter of law, or, in the alternative, for new trial or remittitur. This appeal followed.

## II.

### A.    Rule 50(b) Waiver

At the outset, plaintiff argues that the OCRC waived its right to make a post-trial Rule 50(b) motion for judgment as a matter of law. Rule 50(b) provided for a renewed motion for judgment as a matter of law "[i]f, for any reason, the court does not grant a motion for

judgment as a matter of law made at the close of all the evidence." Accordingly, this court has held that a court can "consider a motion for judgment notwithstanding the verdict *only if* the moving party has previously made a motion for a directed verdict at the close of all the evidence." *Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1522 (6th Cir. 1990). Here, although the OCRC made a Rule 50(a) motion at the close of plaintiff's case, the motion was not renewed at the close of all of the evidence. As the district court recognized, however, we have also held that a "technical deviation from Rule 50(b)'s command is not fatal." *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 477 (6th Cir. 1990).

Without examining whether there was a "technical deviation," the magistrate judge relied on the general principle that "application of Rule 50(b) in any case should be examined in the light of the accomplishment of [its] particular purpose as well as in the general context of securing a fair trial for all concerned in the quest for truth." *Boynton v. TRW, Inc.*, 858 F.2d 1178, 1185 (6th Cir. 1988) (internal quotation marks and citation omitted). The magistrate judge decided that, in the interest of justice, the motion should be resolved on the merits. Plaintiff rightly argues that the *Riverview* exception has been given limited application to cases where the judge indicated at trial that the renewal of the motion would not be necessary, or where the evidence offered following the unrenewed motion was brief and inconsequential. *Riverview*, 899 F.2d at 477; *see also Bach v. First Union Nat'l Bank*, 149 Fed. App'x 354, 359-60 (6th Cir. 2005).

No waiver was found in *Boynton* because the trial court took the defendant's motion

under advisement and the defendant presented only one witness whose testimony was "brief and largely cumulative." 858 F.2d at 1186. In contrast, this court found waiver in *A+ Homecare*, where (1) the district court did not take the Rule 50(a) motion under advisement or otherwise signal that the defendant need not renew the motion at the close of all the evidence, and (2) the testimony from the defendant's two additional witnesses was important to the defense and could not be characterized as cumulative or inconsequential. *A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 449 (6th Cir. 2005); *see also Jacskson v. Huron Dev. Ltd.*, No. 98-2356, 2000 WL 282482, at * 3 (6th Cir. Mar. 9, 2000) (unpublished).

Here, the magistrate judge denied the OCRC's motion at the conclusion of the plaintiff's case without taking it under advisement or indicating that it need not be renewed at the close of all of the proofs. The OCRC then presented its case through the testimony of three OCRC witnesses over two days of trial. That evidence was not brief, cumulative, or inconsequential to the defense. As a result, we must conclude that the OCRC waived its right to bring a renewed motion for judgment as a matter of law under Rule 50(b). Therefore, the magistrate judge did not err in denying the OCRC's motion. However, since the magistrate judge elected to resolve the motion on the merits, we also address the OCRC's arguments in that regard.[1]

---

[1]Although the parties make no mention of it, Rule 50(b) was amended effective December 1, 2006—after trial but before the OCRC's motion was decided—to *delete* the requirement that a Rule 50(a) motion must be made at the close of all of the evidence. Specifically, Rule 50(b) was amended to read: "If the court does not grant a motion for judgment as a matter of law made under subdivision (a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Because such a motion would still be a renewed motion, however, it would be

**B.       Judgment as a Matter of Law**

Even assuming no waiver, we agree with the magistrate judge that the OCRC did not establish that it was entitled to judgment as a matter of law.  We review a district court's decision denying a Rule 50(b) motion for judgment as a matter of law *de novo*, applying the same test as the district court.  *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005); *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001).  In a federal question case, the motion may be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of fact for the jury, and reasonable minds could not come to a conclusion other than one favoring the movant.  *Gray*, 263 F.3d at 598.  In reviewing the decision not to grant judgment as a matter of law, we may not weigh the evidence, question the credibility of the witnesses, or substitute our own judgment for that of the jury.  *Id*. (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000)).

Under the Rehabilitation Act, which incorporates the standards of the Americans with Disabilities Act, disability discrimination includes

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. § 12112(b)(5)(A).  A plaintiff can establish a *prima facie* case of discrimination for failure to make reasonable accommodation by showing that:  (1) she is disabled within

---

limited to the grounds advanced in the pre-verdict Rule 50(a) motion.  The OCRC has not argued that the amended rule applies.

the meaning of the Act; (2) she is a "qualified individual with a disability," meaning she is capable of performing all essential functions of her position *with or without* accommodation; (3) her employer was aware of her disability; (4) an accommodation was needed, *i.e.*, a causal relationship existed between the disability and the request for accommodation; and (5) the employer denied her reasonable accommodation. *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004). Once this showing is made, the burden shifts to the employer to demonstrate that an accommodation would impose an undue hardship. *Id*.; *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183-84 (6th Cir. 1996).

The OCRC argues on appeal that there was no legally sufficient evidentiary basis for the jury to find that plaintiff had proved the fourth or fifth elements of her claim. Further, attacking the damage award, the OCRC argues that plaintiff's decision to stop working and take disability retirement could not constitute constructive discharge as a matter of law.

### 1.    Accommodation needed[2]

Defendant contends that plaintiff failed to present any objective evidence that there was a causal relationship between her disability and the requested accommodation. It is not the objectiveness of the evidence that we are concerned with, but the objective reasonableness of the requested accommodation. In explaining the burdens of proof under the ADA in *Monette*, we held that "the disabled individual bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively

---

[2]The jury was instructed that the plaintiff bore the burden of establishing that: "The accommodation was needed, presently or in the near future, in order for the disabled employee to perform the essential functions of the position, *i.e.*, that a causal relationship existed between the disability and the request for accommodation." Defendant does not challenge the jury charge on this element.

reasonable." 90 F.3d at 1183. Ultimately, the court concluded that the plaintiff had not established that the requested accommodation—that he stay on unpaid medical leave indefinitely until a position he could perform opened up—was a "reasonable" one.[3]

There is no suggestion by defendant that plaintiff's requested accommodation was not objectively reasonable because it was too vague, or was not otherwise available to plaintiff. For this reason, *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634-35 (6th Cir. 1998), is distinguishable.

The plaintiff in *Cassidy* had respiratory problems and was transferred from a job in the plant to the computer center in corporate headquarters, which had filtered and air-conditioned air. While working there, fumes from a room painted the night before caused plaintiff problems that required an emergency room visit. Plaintiff did not return to work, but provided her employer with a doctor's note stating that she needed a "workstation free of exposure to any agent that may trigger asthma or cause a drop in peak flow and that is well ventilated." *Id.* at 632. This court concluded that summary judgment was properly entered for the defendant because plaintiff failed to meet her burden of proposing an objectively reasonable accommodation. Specifically, the proposed accommodation of essentially an allergen-free workplace was too vague to inform the defendant of what was needed, or had been attempted and was otherwise unavailable. Here, plaintiff requested an office with a

---

[3]Defendant's reliance on *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002), is also misplaced. Although the Court noted that an ineffective modification will not accommodate a disabled individual's limitations, the Court was explaining why effectiveness was not the sole measure of the reasonableness of a proposed accommodation. Indeed, the Court held that an employer's showing that a requested accommodation conflicts with seniority rules would ordinarily be sufficient to show, as a matter of law, that the accommodation was not a reasonable one.

climate control unit, albeit one that had been cleaned, because extremes of temperature made her symptoms worse and triggered asthma attacks. This was not too vague to be understood, and was not unavailable in the OCRC offices since one or more exterior offices were vacant.

Rather, the OCRC argues, seemingly in the alternative, that there was no legally sufficient evidence to support a finding that the accommodation was "needed" (1) because plaintiff had managed to perform the essential functions of her job for months without it; and (2) because the requested accommodation would not have been effective anyway. We are not troubled by the first argument because there was evidence that although plaintiff managed to perform, despite her doctor's opinion that she was totally disabled, it became more and more difficult until plaintiff could not continue to work without accommodation any longer. The irony is that the defendant does not argue that plaintiff could have continued working *without* accommodation, but maintains that plaintiff could not have continued working any longer even *with* accommodation.

Nor is this case like *Gaines v. Runyon*, 107 F.3d 1171, 1178 (6th Cir. 1997), in which this court explained that the plaintiff must demonstrate that he cannot perform the essential functions of the job without the requested accommodation. The employee in *Gaines* requested a day-shift assignment as an accommodation for his epilepsy, and relied on a doctor's recommendation that it "would be best" if the plaintiff stayed on a day shift so he could continue his regular sleep habits. This evidence did not satisfy plaintiff's burden of proof because the opinion was based on the mistaken understanding that plaintiff was working the day shift at the time. In fact, he was working a split schedule of three days and

two nights and had experienced no problems doing so. A second doctor also recommended accommodation based on inaccurate facts, including that plaintiff's "capacity" at work had changed quite frequently even though he had worked the same schedule for the previous seven months. The requested assignment was also not needed to accommodate an inability to drive, since the neurologist had concluded that he was legally able to drive. It is not difficult to see that the plaintiff in *Gaines* did not demonstrate that the accommodation was needed, "*i.e.*, that a causal relationship existed between the disability and the request for accommodation."

Defendant relies on Dr. Baughman's testimony to call into question whether plaintiff needed the requested accommodation. Most pointedly, Dr. Baughman testified that he did not have any *direct* evidence that working in a cold or dry environment contributed to her having more infections or exacerbated her condition. But, he explained that he relied on the information that plaintiff provided to him, as well as historical information that other people with asthma find cold, dry, or moldy environments will often exacerbate their condition. Dr. Baughman indicated that plaintiff's overwhelming health problems were related to steroid use and underlying damage to her lungs rather than to a cold or dry office environment. Plaintiff, of course, did not claim that her lung condition was caused by the work environment, only that the cold temperatures made her symptoms worse. It is true that plaintiff's medical condition ultimately progressed to the point that even she conceded she could not have worked even with accommodation.

In that regard, the OCRC argues that there was no evidence that a different office

would have successfully delayed the inevitable—that being, that plaintiff needed to completely stop working.  In support of its position, defendant relies on *Smith v. Honda of Am. Mfg., Inc.*, 101 Fed. App'x 20, 26 (6th Cir. 2004)—a case brought by a production line employee with breathing problems who sought transfer to an office position as an accommodation.

The plaintiff in *Smith* was transferred to an assembly department position based on data showing the area had the lowest concentrations of the specified airborne contaminants. She was not transferred to an office job both because she would still be required to go into production areas with contaminants, and because plaintiff was not otherwise qualified to do the office jobs that came open.  This court concluded that Honda had discharged its obligation to Smith, and added that the accommodation was ineffective since she continued to have breathing problems.  Defendant relies on the court's further observation that "the ADA does not demand the impossible or the pointless, and there is simply no evidence showing either that her continuing problems were caused by continued exposure to irritants at her new job posting, or that transfer to a desk job within Honda's facility would have helped her.  The undisputed evidence indicates precisely the opposite." *Id*. at 26.  In making this observation, the court was not requiring that a plaintiff prove a proposed accommodation would have worked in order for it to be objectively reasonable, but simply found  that the plaintiff's proofs failed in that case because reasonable accommodation was provided and had not helped.

In this case, Dr. Baughman testified that, given the severity of plaintiff's symptoms,

it seemed unlikely that plaintiff could have "toughed it out" for another year even if she had been in a more comfortable environment. Yet, plaintiff had continued to work without accommodation for nine months beyond Dr. Baughman's determination that she was totally disabled. Dr. Baughman explained that he had other patients who continued to work with accommodations, and said that it was up to plaintiff to decide how long she could work. Plaintiff testified that she loved her job and wanted to keep working, and that she could and would have worked at least another year longer if she had been able to work in a climate controlled office.

There was also evidence from which the jury could infer that the cold office environment exacerbated plaintiff's symptoms. Specifically, plaintiff made nine trips to the emergency room (ER) for breathing problems during 2003. Two of those times she was taken to the ER from work: once because of an asthma attack in May 2003, and once after a fire drill in July 2003. In all, plaintiff went to the ER once in April, twice in May, once each in July and August, and three times in September 2003. The ninth visit of 2003 was in November, after plaintiff went on disability. By comparison, plaintiff went to the ER for breathing problems four times in 2002, and only twice in 2004. Although plaintiff conceded that by 2005 she could not have returned to work even with accommodation, there was evidence from which a jury could conclude that plaintiff could have and would have continued to work through October 2004 if she had been provided reasonable accommodation.

Taking the evidence in the light most favorable to plaintiff, and keeping in mind that

we may not weigh the evidence, question the credibility of witnesses, or substitute our own judgment for that of the jury, there was sufficient evidence from which a reasonable juror could conclude that plaintiff demonstrated that she "needed" the accommodation; *i.e.*, that there was a causal relationship between her disability and the requested accommodation.

## 2. Duty to accommodate

Next, the OCRC contends that it was entitled to judgment as a matter of law because it fulfilled its obligation to offer plaintiff a reasonable accommodation, but she rejected it without "giving it a chance." It is true that, in May 2003, McEntire proposed that plaintiff move into the exterior office then occupied by Roberson. There was a dispute, however, whether plaintiff refused that offer at the time, in the emails that followed, or at some later time. Plaintiff testified that she did not refuse to move, but only wanted the climate control unit cleaned because she had seen it with the cover off before. Even McEntire, who reported that plaintiff had rejected the offer, subsequently asked for clarification on the "status of her acceptance." Plaintiff's response, insisting that the unit be cleaned, suggesting that maintenance personnel might not be competent to clean it properly, and indicating that she would have to consult with counsel before finalizing a decision, was not an unequivocal rejection that would require entry of judgment as a matter of law.

Further, there was evidence that McEntire inquired about having the unit cleaned, but no evidence that plaintiff was advised either that it could be cleaned effectively, or that it had been cleaned, at any time before she applied for disability. Nor did plaintiff hear anything from McEntire or any other supervisor after she learned from Roberson that the unit had been

replaced in September 2003. Gaither-Thompson testified that she and McEntire had discussed either cleaning the unit or moving plaintiff to the "plant" office, but McEntire chose to do neither. Gaither-Thompson explained that McEntire was exasperated and just wanted plaintiff to get frustrated and leave like another employee named Cornelius had previously. Although McEntire denied it, Gaither-Thompson also testified that McEntire did not want plaintiff's office located near hers because she believed plaintiff to be a demonic spirit with an evil heart. Finally, the jury also could consider whether the OCRC failed to participate, in good faith, in an "interactive process" for determining an appropriate reasonable accommodation. 29 C.F.R. § 1630.2(o)(3); *see also Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871-72 (6th Cir. 2007); *Smith v. Henderson*, 376 F.3d 529, 536 (6th Cir. 2004). In all, there was sufficient evidence from which the jury could conclude that the OCRC failed to offer a reasonable accommodation or participate in good faith in the interactive process.

### 3.   Constructive discharge

The existence of constructive discharge "depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee." *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982). A finding of constructive discharge requires the determination that "'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* (citation omitted). Defendant argues that there was insufficient evidence to support a finding of constructive discharge in

this case as a matter of law.

Defendant denies that it deliberately made plaintiff's working conditions intolerable—noting that plaintiff also complained that the entire building was too cold. Defendant emphasizes that plaintiff was allowed to do breathing treatments at work, was permitted to use personal leave and vacation time when she was sick, and was offered an opportunity to move into the exterior office she had previously occupied. In terms of deliberateness, however, there was evidence that one or more exterior offices were left vacant, that the climate control unit was never cleaned so plaintiff could make the move, and that McEntire wanted plaintiff to become frustrated and leave the OCRC as another employee had. Nor can defendant claim to have been unaware of plaintiff's desire to be moved to an exterior office as an accommodation for her disability.

While failure to give an employee an exterior office would not normally be sufficient as a matter of law to establish constructive discharge, this is not a typical constructive discharge case because plaintiff's claim was that the defendant's actions denied plaintiff reasonable accommodation and forced her to take disability retirement early. *See Smith*, 376 F.3d at 534 (finding question of fact on constructive discharge where plaintiff was denied accommodation that would allow her to perform within her medical restrictions). The OCRC argues that there was no evidence that would support a finding that plaintiff was forced to retire by the failure to accommodate rather than simply realizing that her medical condition made it impossible to continue working.

On the contrary, there was conflicting evidence on this question, and we cannot say

that reasonable minds could come to but one conclusion in favor of the defendant on this issue. There was evidence that plaintiff could have applied for disability retirement months earlier, persisted in asking for accommodation, and finally decided that she could not work another winter without accommodation. The evidence, taken in the light most favorable to plaintiff, was sufficient to create a question of fact whether defendant made plaintiff's working conditions so intolerable by failing to provide reasonable accommodation that a reasonable person in her shoes would have felt compelled to go on disability.

### 4.    Damages and disability benefits

Without challenging the jury instruction on the issue, defendant asserts that plaintiff failed to sufficiently explain the inherent contradiction between claiming to be disabled under the Ohio Public Employees Retirement System (OPERS) and claiming to be a qualified individual with a disability within the meaning of the Act.[4] As plaintiff points out, the Supreme Court has held that an individual's claim for disability benefits does not inherently conflict with a claim for damages for failure to reasonably accommodate her disability. *Cleveland v. Policy Mgmt. Sys., Corp.*, 526 U.S. 795, 806 (1999). The thrust of defendant's argument, while invoking *Cleveland*, actually seems to be a challenge to the sufficiency of the evidence to establish that plaintiff was a qualified disabled employee after she went on

---

[4]The jury was instructed: "That a person is unable to work for the purposes of receiving Social Security or State of Ohio disability benefits does not necessarily mean that she was not a qualified individual under the Rehabilitation Act. This is because disability retirement benefits are granted even if the employee may be capable of performing her job with an accommodation." The jury was instructed that if, despite having received disability benefits, plaintiff could nonetheless have performed the essential functions of her job with or without a reasonable accommodation, they must find that she was a qualified individual with a disability.

disability retirement. In other words, defendant argues that there was no evidence that plaintiff would have been able to continue working even with reasonable accommodation.

Plaintiff conceded that this was true by 2005, but, as discussed above, plaintiff presented evidence that, with accommodation, she could and would have continued to perform the essential functions of her job for at least another year. Indeed, the jury's damage award suggests that this testimony was found to be credible.

## C.     New Trial or Remittitur

A new trial is warranted when the jury has reached a seriously erroneous result, as evidenced by the verdict being against the weight of the evidence, the damages being excessive, or the trial being unfair to the moving party in some fashion. *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996). The court may alternatively grant remittitur of the amount of damages awarded, but only when the award clearly exceeds the maximum amount that a jury could reasonably find to be compensatory for the loss. *Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 397 (6th Cir. 1993). We review a district court's denial of a Rule 59 motion for new trial or remittitur of damages for abuse of discretion. *Id.*[5]

### 1.     Jury Instruction

Jury instructions are reviewed as a whole to determine whether they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury. *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000). "'A judgment may be

---

[5]Although defendant does not specifically argue that the verdict is against the weight of the evidence, "a jury's verdict should not be overturned as being against the weight of the evidence unless that verdict was unreasonable." *Holmes*, 78 F.3d at 1047. The verdict here cannot be said to be unreasonable.

reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'" *Id*. (citation omitted). Defendant argues that the constructive discharge instruction was erroneous and misleading because it stated that the employee "must have actually stopped working," instead of instructing the jury that the employee "must have actually quit or resigned." While it could be misleading to instruct a jury that it would be sufficient for a plaintiff to have "stopped working," we find that it was neither misleading nor prejudicial in this case because there was no factual dispute over whether plaintiff had left her job. Rather, the dispute was whether she left voluntarily or was forced to leave early by defendant's failure to provide reasonable accommodation.

In *Conrad v. Chaco Credit Union, Inc.*, No. 90-3880, 1991 WL 216463 (6th Cir. Oct. 24, 1991) (unpublished), this court agreed with the district court's determination that the plaintiff was not entitled to a jury instruction on constructive discharge. There, the plaintiff had a breakdown when told she was being demoted without a loss of pay, and was off work receiving disability insurance benefits. She was free to return to work when released by her doctors; her employer continued to check when she might return; and she neither resigned nor was discharged. The plaintiff brought a claim of age discrimination, but was precluded from claiming constructive discharge because she had not resigned or been discharged. This court explained: "It is implicit in the decisions dealing with constructive discharge that a plaintiff must be separated from employment by some mechanism like resignation or retirement." *Id*. at *9 (citing cases of involuntary retirement, forced early retirement, resignation, and disability retirement).

Defendant's argument, which actually appears to be a challenge to the sufficiency of the evidence, is that plaintiff cannot maintain a claim for constructive discharge because she did not legally sever her employment relationship. In the motion for judgment as a matter of law, defendant characterized plaintiff as someone "on injured reserve" who is simply away from work taking advantage of the state's disability program. The OCRC relies on testimony that OPERS provides a statutory right to reinstatement from disability retirement during the first five years if an annual review reveals that the retiree is no longer disabled. OHIO REV. CODE § 145.362. Be that as it may, defendant offers no authority to support its contention that this right of reinstatement precludes, as a matter of law, the plaintiff's claim that she was constructively discharged by being forced to take disability retirement early. The issue for the jury was whether plaintiff went on disability voluntarily, or was forced into taking disability retirement earlier than she would have by the failure to reasonably accommodate her disability.

### 2. Damages

By way of remittitur, defendant seeks to reduce the jury's award of lost wages and benefits on the grounds that it was purely speculative whether plaintiff could have worked for a year longer than she did. Despite conflicting evidence on the issue, it did not require speculation for the jury to find that plaintiff could have and would have worked another year if she had not been denied reasonable accommodation. It was within the jury's purview to decide whether and how much longer plaintiff would have worked in calculating the amount of damages reasonably necessary to compensate her for lost wages and benefits. A damage

award must stand unless it is beyond the range supportable by the proof, is so excessive as to shock the conscience, or is the result of mistake. *Leila Hosp. & Health Ctr. v. Xonics Med. Sys.*, 948 F.2d 271, 278 (6th Cir. 1991). The magistrate judge in this case did not abuse his discretion in denying defendant's motion for new trial or remittitur of the damages.

**AFFIRMED.**