RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0143p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ANDREA TUMBLESON,

          *Plaintiff-Appellant,*

    *v.*

LAKOTA LOCAL SCHOOL DISTRICT; LAKOTA LOCAL SCHOOL DISTRICT BOARD OF EDUCATION,

          *Defendants-Appellees.*

No. 25-3548

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:23-cv-00395—Douglas Russell Cole, District Judge.

Decided and Filed: May 13, 2026

Before: THAPAR, BUSH, and MURPHY, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:** Marc D. Mezibov, MARC D. MEZIBOV, LLC, Cincinnati, Ohio, for Appellant. John C. Albert, AMUNDSEN DAVIS, LLC, Columbus, Ohio, for Appellees.

───────────────

**OPINION**

───────────────

MURPHY, Circuit Judge. Andrea Tumbleson suffers from a rare disease that has gradually caused her to lose her vision and hearing. Despite her disabilities, she has excelled as an art teacher in the Lakota Local School District. After teaching for many years, Tumbleson decided that she needed a guide dog to help her navigate the world. She sought to use paid sick leave to attend a mandatory three-week training course to obtain her guide dog. Lakota denied her request for *paid* leave because this training did not qualify as a "personal illness" under the

district's sick-leave policy.  But it allowed her to take *unpaid* leave as an accommodation under the Americans with Disabilities Act (ADA).  Tumbleson sued Lakota.  She alleged that the denial of paid leave violated the ADA both because it amounted to disability discrimination and because it failed to properly accommodate her disability.  And she suggested that she had the right to use paid leave under the Family and Medical Leave Act (FMLA).  The district court granted summary judgment to Lakota.

We agree with this result.  Tumbleson's disparate-treatment claim under the ADA fails because she lacks evidence that Lakota treated nondisabled personnel more favorably.  And her failure-to-accommodate claim under the ADA fails because unpaid leave qualified as a "reasonable" accommodation.  Lastly, Tumbleson's FMLA claim fails because this law entitled her to paid sick leave only if Lakota would "normally" provide that leave under the circumstances.  And Tumbleson raises only a bare-bones challenge to the district court's conclusion that her guide-dog training did not qualify for paid leave under Lakota's sick-leave policy.  We affirm.

I

Tumbleson obtained a bachelor's degree in fine arts and a master's degree in art education.  In 1997, she began to teach at Lakota Local School District outside Cincinnati, Ohio.  She has remained at Lakota Plains Junior School for over twenty years teaching art to seventh and eighth graders.  The record leaves no doubt that Tumbleson is an excellent teacher.  Rob Kramer, Lakota's Executive Director of Human Resources, opined that she does a "wonderful job" and consistently receives "positive evaluations."  Kramer Dep., R.21-1, PageID 441–42.  Lakota has also never disciplined her for any type of misconduct.

Tumbleson's health challenges have made her teaching success even more impressive.  She suffers from a rare, incurable "genetic disease" called "Usher syndrome" that has caused progressive hearing and vision loss.  Tumbleson Dep., R.19-1, PageID 136–37, 174–76.  Usher syndrome is an "incapacitating" disease for "many" people.  Neff Dep., R.20-1, PageID 370.  So Tumbleson's primary-care doctor was "shocked" to learn that Tumbleson "was not on permanent disability" and opined that Tumbleson has "worked very hard to" "live a normal life[.]"  *Id.*

Tumbleson started losing her hearing as a child.  For a long time, she managed to get by using hearing aids.  By 2005, though, she "had hardly any hearing left."  Tumbleson Dep., R.19-1, PageID 140.  In the ensuing years, she opted to get "cochlear implants" in both ears. *Id.*, PageID 136, 140, 230.  These implants bypass a person's damaged hearing organs by sending electric signals to the brain through the auditory nerve.  *See* Cochlear Implants, Nat'l Inst. on Deafness and Other Commc'n Disorders (June 13, 2024), https://www.nidcd.nih.gov/health/cochlear-implants.  The brain interprets these signals as sound. *See id.*  The implants have allowed Tumbleson to continue to hear even though she is now "totally deaf."  Tumbleson Dep., R.19-1, PageID 152–53.

Tumbleson's sight has deteriorated more slowly than her hearing.  Her Usher syndrome has led her to develop "retinitis pigmentosa."  *Id.*, PageID 136–37.  This disease causes the "cones and rods" in her eyes "to die."  *Id.*, PageID 137.  It has gradually diminished her peripheral vision and made it more difficult for her to see in the dark.

Over the years, Lakota has accommodated Tumbleson's disabilities in a few ways.  By 2012, her vision loss had reached a point where she needed "more lighting" in her classroom. *Id.*, PageID 141.  Her school's principal ensured that the room had non-fluorescent lights in the ceiling and extra lamps on the floor.  In 2021 or so, she also received a computer with a larger monitor for use at school.  The district later set up this school computer with "dark mode," and the computer automatically converts PowerPoint presentations and similar files to a format that she can more easily read.  *Id.*, PageID 147–48.  Around the same time, Lakota also gave her a smaller laptop with what she described as a "giant monitor" to have at home for school projects. *Id.*, PageID 148.

Tumbleson started using a cane to help her get around in 2012.  The next year, she sought a service dog from a New York provider.  According to Tumbleson's doctor, guide dogs "essentially replac[e]" a deaf and blind person's "hearing and vision" and open "an entirely new . . . world" for individuals with these disabilities.  Neff Dep., R.20-1, PageID 374.  The dogs keep their owners "safe" by, for example, watching for cars when "they are trying to cross the street" or helping them "navigate stairs safely."  *Id.*, PageID 372, 375.  When Tumbleson first applied for a service dog, however, the New York provider decided that she did not qualify.

She found this denial "devastating."  Tumbleson Dep., R.19-1, PageID 152.  So it took her almost a decade (and the continued deterioration of her eyesight) to apply again.

In 2022, Tumbleson's mobility trainer recommended that she contact Leader Dogs for the Blind in Rochester Hills, Michigan.  She applied to obtain a guide dog from this organization.  Leader Dogs accepted her into its five-day orientation and mobility training.  It scheduled this training for late September in Michigan.

Tumbleson had to miss school at Lakota during these five training days.  So she emailed her principal and Kramer (the human-resources director) asking to use sick days.  Kramer quickly approved the sick leave, explaining that Lakota "typically" required employees to "complete FMLA/Medical Leave paperwork" only for "extended absences" of "10 days or more."  Emails, R.19-2, PageID 254.

Tumbleson completed the training as scheduled.  She learned "how to use [her] cane effectively" while navigating cities, strolling on country roads, descending stairs, and the like.  Tumbleson Dep., R.19-1, PageID 156, 158.  On the last day, she practiced using a guide dog.  For the first time "in years," Tumbleson could "look up" while walking with the dog.  *Id.*, PageID 163.  At the training's conclusion, Leader Dogs told Tumbleson that she "was definitely guide-dog ready." *Id.*

Thirty days later, Tumbleson formally applied for a guide dog.  The rigorous application process required her to video a couple hours of her normal routine, get a physical exam, and obtain a doctor's signature certifying that she is legally blind.  Early in 2023, Tumbleson learned that Leader Dogs had approved her application and matched her with a dog—Henry.

But the approval came with a catch: Tumbleson had to attend another training course, this time for three weeks.  Leader Dogs assigned Tumbleson to a special class for deaf and blind individuals at the end of May 2023.  That unfortunate timing required Tumbleson to miss the end of the school year and her son's high-school graduation.  Nor could she reschedule.  Leader Dogs offered the special class only twice a year and could not hold Henry for her.  If Tumbleson did not attend the May training, then, she might have to "wait two or three years for a guide dog." *Id.*, PageID 166.  She felt bound to attend to help her "life tremendously." *Id.*, PageID 177.

After securing a substitute teacher and speaking with her school principal about the need to miss much of May, Tumbleson emailed Kramer with her leave request.  Kramer responded that the training "sound[ed] like a great opportunity" but asked her to clarify what her "official 'leave' request" was.  Emails, R.19-2, PageID 258.  Tumbleson replied that she believed her leave was "medically related" and thus sought to use thirteen paid "sick days (FMLA?)."  *Id.*, PageID 260.

Kramer granted her request in part.  He believed that the guide-dog training did "not fall into the permissible reasons for" paid sick leave or FMLA leave.  *Id.*, PageID 268.  As Kramer explained, an employee may take paid sick leave only for "personal illness, injury or exposure to contagious disease," and the employee may take FMLA leave only in limited circumstances, including a "serious health condition that makes the employee unable to perform the functions of his or her job[.]"  *Id.*  Kramer did not believe that the guide-dog training fell within either category.  Still, he concluded that Tumbleson could attend the training using a mix of paid personal days and unpaid leave as an accommodation under the ADA.  That March, Kramer emailed Tumbleson with his formal decision denying her request for paid sick leave but granting her unpaid leave as an ADA accommodation.  *Id.*, PageID 272–73.

Tumbleson took unpaid leave for the rest of the school year from May 8 to May 24.  She successfully obtained Henry.  The dog "has made a positive impact at [her] school."  Tumbleson Dep., R.19-1, PageID 220.

While at a regular check-up after the training, Tumbleson told her doctor about Lakota's refusal to give her paid leave.  Tumbleson's doctor volunteered to write a letter to Lakota.  The letter explained that Tumbleson took the May leave "for medical reasons" both because the guide dog was "part of [Tumbleson's] treatment plan" for Usher syndrome and because the guide-dog "process require[d] training to keep her safe."  Letter, R.20-2, PageID 396.  Tumbleson's lawyer sent this letter to Lakota and threatened to sue if the school district did not retroactively allow her to take paid sick leave for the training.

When Lakota did not change its mind, Tumbleson filed this lawsuit.  She brought two ADA claims and one FMLA claim.  She first alleged that Lakota's refusal to allow her to take

paid leave violated the ADA in two ways: by discriminating against her because of her disability and by failing to accommodate her disability.  She next alleged that Lakota violated the FMLA by denying her request to use accrued paid sick leave in lieu of unpaid leave.  Tumbleson also alleged analogous claims under Ohio law, but she did not pursue them on appeal.  She has thus forfeited (indeed, likely waived) any challenge to their dismissal.  *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022).  We thus must consider only the two ADA claims and single FMLA claim.

After discovery, the parties moved for summary judgment on these three claims.  The district court ruled for Lakota.  *See Tumbleson v. Lakota Loc. Sch. Dist.*, 2025 WL 1797094, at *11 (S.D. Ohio June 30, 2025).  Tumbleson appealed.  We review the district court's decision de novo.  *See EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (en banc).

II

A. ADA Claims

Tumbleson claims that Lakota violated the ADA by denying her paid sick leave to attend the Leader Dogs training.  The ADA's general ban on disability-based employment discrimination provides: "No covered entity shall *discriminate against a qualified individual on the basis of disability* in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (emphasis added).  The law defines the phrase "discriminate against a qualified individual on the basis of disability" in a unique way to include several specific practices that might otherwise fall outside the phrase's ordinary meaning.  *Id.* § 12112(b).  The general ban applies, for example, if an employer fails to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the accommodations would "impose an undue hardship" on the employer's operations.  *Id.* § 12112(b)(5)(A).  Tumbleson relies on § 12112(a)'s general ban and this specific definition to pursue both a disparate-treatment theory and a failure-to-accommodate theory.

1. *Disparate Treatment*. The ADA's general rule bars an employer from "discriminat[ing] against" an employee (that is, "mak[ing] an adverse distinction with regard to" the employee) "on the basis of" the employee's "disability" in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); 4 Oxford English Dictionary 758 (2d ed. 1989). To describe an employee's disability as the "basis" for an unfavorable employment action, we must be able to say that it was the "main constituent" or "fundamental ingredient" of that action. 1 Oxford English Dictionary, *supra*, at 985; *see Niblock v. Univ. of Ky.*, 165 F.4th 460, 469–70 (6th Cir. 2026) (Sutton, C.J., and Murphy, J., concurring). This language thus bars what the Supreme Court has called "the most easily understood type of discrimination": disparate treatment. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (citation omitted). That is, an employer may not "treat[] some people less favorably than others" in a term or condition of employment "because of their" disability. *Id.* (citation omitted).

We use the "*McDonnell Douglas* burden-shifting framework" when employees rely on circumstantial evidence to prove their disparate-treatment claims under the ADA (and many other statutes). *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under this framework, Tumbleson must first make out a prima facie case. *See Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 & n.2 (6th Cir. 2012). This step requires her to show, among other things, that Lakota took the type of adverse action against her that the ADA covers (such as discrimination in "hiring," "compensation," or some other employment "term[]" or "condition[]"). 42 U.S.C. § 12112(a); *Rosebrough*, 690 F.3d at 431. It also requires her to show that Lakota did not take the same action against "similarly situated non-disabled employees" and thus treated them "more favorably" than her. *Rosebrough*, 690 F.3d at 431 n.2; *see Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999). If she satisfies her prima facie case, Lakota must then identify its neutral reason for taking the adverse action. *See Hrdlicka*, 63 F.4th at 567. If it meets this burden, Tumbleson lastly must show that this reason was pretextual and used to hide disability discrimination. *See id.*

The district court rejected Tumbleson's claim on the ground that she failed to make out a prima facie case. *See Tumbleson*, 2025 WL 1797094, at *7–9. The court first suggested that

Lakota's denial of paid leave was not an adverse employment action under the ADA because it allowed Tumbleson to take unpaid leave. *See id.* at *8. But recent caselaw renders this holding open to debate. The district court reasoned that the ADA does not prohibit an employment action unless it qualifies as "a *materially* adverse change in the terms or conditions of employment[.]" *Id.* (emphasis added) (citation modified) (quoting *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008)). Since *Talley*, however, the Supreme Court has held that Title VII requires an employee to show only "some harm"—not "significant," "serious," or "substantial" harm—with respect to "an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024) (citation omitted). And because the ADA also reaches discrimination in the "terms" and "conditions" "of employment," 42 U.S.C. § 12112(a), other courts have extended *Muldrow* to this disability law. *See Scheer v. Sisters of Charity of Leavenworth Health Sys., Inc.*, 144 F.4th 1212, 1215–16 (10th Cir. 2025); *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 112 (1st Cir. 2024); *cf. McNeal v. City of Blue Ash*, 117 F.4th 887, 900 (6th Cir. 2024). One might describe the denial of paid leave as a "harm respecting" a "term or condition of employment." *Muldrow*, 601 U.S. at 355. After all, an unpaid employee seems "worse off" than a paid one. *Id.* at 359.

That said, we need not resolve Tumbleson's appeal on this adverse-action element. We instead agree with the district court's second rationale: that Tumbleson failed to show that Lakota treated "similarly situated" employees more favorably in their requests for paid leave. *Tumbleson*, 2025 WL 1797094, at *8. Although the district court analyzed this "similarly situated" question at the prima facie stage, the question also matters to the ultimate pretext analysis. *See Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 255 (6th Cir. 2023); *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 891–92 (6th Cir. 2020); *see also McDonnell Douglas*, 411 U.S. at 804. And here, Lakota provided a neutral reason for denying Tumbleson paid sick leave: her request to attend guide-dog training did not fall within the "definition of sick leave" under the school board's sick-leave policy, Ohio law, and the collective-bargaining agreement. Kramer Dep., R.21-1, PageID 422, 449, 458–59. We thus jump to the final pretext step by asking whether Tumbleson has enough evidence to create a jury question over whether Kramer denied her leave because of her disability rather than her training's failure to qualify for leave. *See Hrdlicka*, 63 F.4th at 569.

To show that Kramer (the decisionmaker) harbored illegal animus, Tumbleson argues that he "routinely granted" *all* other teachers sick leave without going through the "formalities" that he imposed on her. Appellant's Br. 23. At the summary-judgment stage, though, she had to "identify 'specific facts, as opposed to general allegations,' establishing" that Lakota treated similarly situated nondisabled employees better. *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (quoting 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2727.2, at 501 (4th ed. 2016)). Yet she does not offer a single example of a nondisabled employee who received sick leave even when the employee's proposed absence did not qualify for that leave.

Instead, Tumbleson cites Kramer's testimony that the sick-leave "system [was] made to be run through the employee[s]" and that the human-resources department did not always preclear the leave. Kramer Dep., R.21-1, PageID 413. But she misunderstands his testimony. He explained that if an employee requests *short-term* leave for "less than ten days," the human-resources department often does not get involved and a school principal may approve the request. *Id.*, PageID 412. But the department does evaluate a leave request if an employee has "a need for more days" to ensure that the leave qualifies. *Id.*, PageID 413. If anything, Tumbleson's own experience shows that Lakota neutrally applied this distinction. She *benefited* from the rule for short-term leave because Lakota allowed her to use paid sick leave to attend Leader Dogs' five-day training in September 2022. It was only when Tumbleson requested to take *more* than "ten days" that Kramer analyzed the question and decided that the training did not qualify. *Id.*, PageID 412. So the undisputed facts show that Kramer applied the same rules to Tumbleson that he applied to everyone else.

As a fallback, Tumbleson argues that the Health Insurance Portability and Accountability Act (HIPAA) made it "virtually impossible" for her to find comparators. Appellant's Br. 24. Even assuming (perhaps questionably) that an employer like Lakota would qualify as a "covered entity" under HIPAA, *see* 45 C.F.R. § 160.103, the law does not bar disclosure of health information in *all* circumstances. It, for example, does not prohibit disclosure of protected health information in response to a "discovery request" in litigation if the requesting party obtains a protective order. *Id.* § 164.512(e)(1)(ii)(B). So HIPAA did not exempt Tumbleson's counsel from the normal summary-judgment rules. Yet nothing in the record suggests that counsel even

sought discovery about other teachers.  Tumbleson's disparate-treatment claim thus fails for a lack of evidence.

2. *Failure to Accommodate*. The ADA defines the phrase "discriminate against a qualified individual on the basis of disability" to cover an employer's failure to provide a "reasonable accommodation[] to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the accommodation would unduly burden the employer.  42 U.S.C. § 12112(b)(5)(A).  The ADA defines "qualified individual" (in part) as someone who "can perform the essential functions" of a job if the employer grants a "reasonable accommodation" that adjusts the official job duties.  *Id.* § 12111(8).  It adds that a "'reasonable accommodation' may include" (among other things) "modified work schedules" and "other similar" changes.  *Id.* § 12111(9).

Our cases have interpreted this text to adopt another burden-shifting framework.  *See Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 368 (6th Cir. 2024); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007).  Employees must prove that they have a "disability" and are "qualified individual[s]" who can perform the employer-identified "essential functions" of a job—at least with a reasonable accommodation.  42 U.S.C. §§ 12111(8), 12112(b)(5)(A); *see Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020).  Employers must prove that a job duty qualifies as "essential" and that an accommodation would impose an "undue hardship."  42 U.S.C. §§ 12111(8), 12112(b)(5)(A); *see Tchankpa*, 951 F.3d at 811.

The parties dispute only the "reasonable accommodation" part of this framework.  The employee must identify an accommodation and prove its reasonableness.  *See Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010).  How do we decide whether an accommodation is "reasonable"?  The ADA's text makes clear that an accommodation must be *work related*, meaning that it will allow an employee to "perform the essential functions of the" relevant job.  42 U.S.C. § 12111(8).  To qualify as "reasonable," then, an accommodation must alleviate "a key obstacle" that has prevented the employee from being able to perform an essential job function.  *Tchankpa*, 951 F.3d at 812 (quoting *Jakubowski*, 627 F.3d at 202); *see* 29 C.F.R. § 1630.9(d).  So courts will find a proposed accommodation unreasonable if an employee can perform the essential job functions and if the employee requests an

accommodation for *non-work-related* reasons.  *See Tchankpa*, 951 F.3d at 812; *see also Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 557 (6th Cir. 2008).  We thus held that an employer did not have to change an employee's schedule to allow her to avoid heavy traffic because this burden "exist[ed] outside the work environment."  *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 480 (6th Cir. 2012) (citation omitted).

Further, even if an employee needs *some* accommodation, the employer "need not provide the" specific accommodation that the employee wants.  *Trepka v. Bd. of Educ. of the Cleveland City Sch. Dist.*, 28 F. App'x 455, 459 (6th Cir. 2002).  Rather, the employer has "discretion" to choose from among *alternative* reasonable accommodations if they all will permit the employee to perform the job.  *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998); *see Smith v. Honda of Am. Mfg., Inc.*, 101 F. App'x 20, 25 (6th Cir. 2004) (per curiam).  The employer thus may pick an accommodation that is "less expensive" or "easier" to implement when given the choice between two reasonable accommodations.  29 C.F.R. pt. 1630, app. at 428 (2025); *see Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–01 (6th Cir. 1996).  We have held, for example, that a police department could provide an officer a "desk job" even though the officer preferred an "on the street" job with various restrictions.  *See Keever*, 145 F.3d at 812–13.  And we have held that a clothing store could provide a warehouse employee with "leave time" even though the employee preferred a transfer to another warehouse role.  *See Hankins*, 84 F.3d at 801.

This law forecloses Tumbleson's failure-to-accommodate claim.  At the outset, it is not obvious that Tumbleson's proposed accommodation—that Lakota provide her with paid leave to attend the Leader Dogs training—qualified as a reasonable one.  At the time that Tumbleson requested leave, she continued to be an excellent teacher who did a "wonderful job" in the classroom.  Kramer Dep., R.21-1, PageID 441–42.  And we see little record evidence to suggest that the lack of a guide dog stood as an "obstacle" that stopped her from completing any "necessary function" of her teaching role.  *Tchankpa*, 951 F.3d at 812 (quoting *Jakubowski*, 627 F.3d at 202).  Yet we need not decide this issue because Lakota ultimately gave her an accommodation that allowed her to complete the guide-dog training: unpaid leave.

If Lakota's unpaid-leave accommodation were reasonable, then, that fact would preclude Tumbleson's failure-to-accommodate claim because the ADA did not give her the right to her *preferred* accommodation. *See Trepka*, 28 F. App'x at 459; *Keever*, 145 F.3d at 813. Even if we assume that Tumbleson needed a guide dog to work as a teacher, Lakota's accommodation met our reasonableness test. *See Tchankpa*, 951 F.3d at 812. There is no dispute that unpaid leave allowed Tumbleson to attend the Leader Dogs training and bring home Henry. Tumbleson also "offers no evidence linking" *paid* leave "to the performance of her job." *Obnamia v. Shinseki*, 569 F. App'x 443, 445 (6th Cir. 2014) (per curiam). Her doctor's letter, for example, says nothing about whether that leave should be paid or unpaid. So Lakota (not Tumbleson) had the "ultimate discretion" to choose between the paid-versus-unpaid alternatives because both allowed Tumbleson to perform her job. *Trepka*, 28 F. App'x at 459 (quoting *Hankins*, 84 F.3d at 800–01).

Tumbleson responds that unpaid leave was only "partially responsive" to her request because this accommodation required her to go three weeks without pay and caused some financial difficulties for her family. Appellant's Br. 18–19. But these financial difficulties arose "outside the work environment" and so do not go into the reasonableness calculus. *Regan*, 679 F.3d at 480 (citation omitted). Tumbleson's financial difficulties are thus "beyond" Lakota's "duties to accommodate under the ADA." *Zaffino v. Metro. Gov't of Nashville & Davidson Cnty.*, 688 F. App'x 356, 359 (6th Cir. 2017). Indeed, her argument has no stopping point. The ADA says that giving an employee a "part-time" schedule can qualify as a reasonable accommodation. *See* 42 U.S.C. § 12111(9)(B). Under Tumbleson's view, if this employee did not have the financial means to work only part time, the ADA would require the employer to provide full-time pay for the part-time work. The rule requiring an accommodation to be for work-related reasons avoids this result. *See Tchankpa*, 951 F.3d at 812.

Tumbleson next argues that Lakota failed to show that paid leave would impose an "undue burden" on the district. Appellant's Br. 19–20. That fact is true but irrelevant. True, an employer need not provide a reasonable accommodation if it "would impose an undue hardship on the" employer's operations. 42 U.S.C. § 12112(5)(A). In other words, even if paid leave were the only reasonable accommodation, Lakota would not have to provide that leave if it

would cause this hardship. *See Tchankpa*, 951 F.3d at 811. But we need not reach this hardship question because we resolve the appeal on a distinct element. The record proves that two different accommodations—paid leave and unpaid leave—were *both* reasonable. In that scenario, Lakota had the "ultimate discretion" to choose the "less expensive" option even if the more expensive one would not have posed an excessive hardship. *Hankins*, 84 F.3d at 800 (citation omitted); *see Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1011–12 (4th Cir. 2020) (Wilkinson, J.). In sum, because unpaid leave allowed Tumbleson to obtain her guide dog, Lakota met its obligation to provide a reasonable accommodation. The ADA required nothing more.

## B. FMLA Claim

In the alternative, Tumbleson claims that the FMLA required Lakota to grant her request for paid sick leave to attend the Leader Dogs training. This law requires employers to give eligible employees "12 workweeks of leave" in a year for several qualifying events or conditions. 29 U.S.C. § 2612(a)(1). As relevant now, an employee may take leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Id.* § 2612(a)(1)(D). And an employer may not "interfere with, restrain, or deny the exercise of" an employee's "right" to this leave. *Id.* § 2615(a)(1).

Although the FMLA requires employers to grant leave, it does not require them to pay the employee while off work. Rather, the FMLA presumptively allows employers to treat the required leave as unpaid. *Id.* § 2612(c). That said, the law gives employees the right "to substitute any of [their] accrued paid vacation leave, personal leave, or medical or *sick leave*" for FMLA leave. *Id.* § 2612(d)(2)(B) (emphasis added). But it then makes clear that "nothing in [the FMLA's general rules] shall require an employer to provide paid sick leave or paid medical leave in any situation in which such employer would not normally provide any such paid leave." *Id.* To obtain paid leave, then, the employee must satisfy "the additional requirements in an employer's paid leave policy[.]" *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 281 (6th Cir. 2012).

The parties dispute two questions under this law.  Did Tumbleson qualify for FMLA leave?  And if so, did the law allow her to substitute paid sick leave for the unpaid leave?  Like the district court, we opt not to answer the first question because Tumbleson loses on the second.

Before we reach the second question, though, we start by flagging an oversight in Lakota's position on the first.  The FMLA gives employees the right to take unpaid leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  All agree that Tumbleson has a "serious health condition" because her Usher syndrome qualifies as an "impairment" that requires her to receive ongoing treatment.  *Id.* § 2611(11).  But Lakota contends that a serious health condition "makes" an employee "unable to perform" the employee's job functions only if the condition's physical *symptoms* prevent the employee from working.  *Id.* § 2612(a)(1)(D).  And the school district claims that it was Tumbleson's desire to attend guide-dog training in Michigan (not her disease itself) that made her unable to perform her teaching duties.

Yet Lakota fails to brief critical questions on this topic.  For one thing: What type of causal connection does the FMLA require between a serious health condition and an inability to work?  The FMLA's text uses the word "makes," a verb that means to "cause to exist" or to "bring about[.]"  *American Heritage Dictionary* 1085 (3d ed. 1992).  So the FMLA appears to impose some type of causation standard.  What type?  Is factual (or but-for) cause enough?  *Cf. Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013).  Or does the law require legal (or proximate) cause too?  *Cf. Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014).

For another thing: How would Tumbleson's situation apply under these causation rules?  Her doctor opined that she participated in the guide-dog training as part of her "treatment plan" for her disease.  Letter, R.20-2, PageID 396.  One thus might argue that her disease was a factual cause for her absence because she would not have sought that training (and missed work) "but for" the disease.  *Nassar*, 570 U.S. at 347.  Perhaps that is why courts have held that the FMLA can apply when an employee misses work to seek treatment for a serious health condition.  *See Jones v. C & D Techs., Inc.*, 684 F.3d 673, 677 (7th Cir. 2012).  That said, these courts have also asked whether the employee "*must*" undergo that treatment.  *Id.* (quoting 29 C.F.R.

§ 825.123(a)). So must we decide whether the guide-dog training was a necessary part of Tumbleson's care? And must we consider whether (as Tumbleson's doctor suggested) the "dates could not be modified," so she had no choice but to take the training when she did? Letter, R.20-2, PageID 396. At day's end, the parties did not brief these causation questions, so we save them for another case.

We instead will resolve this case the way that the district court did. It assumed that the FMLA applied to Tumbleson's requested leave. *See Tumbleson*, 2025 WL 1797094, at *10. Recall, though, that the FMLA presumptively grants employees unpaid leave, and Lakota allowed Tumbleson to take this type of leave. *See* 29 U.S.C. § 2612(c). To obtain *paid* leave under the FMLA, Tumbleson needed to show that Lakota "normally provide[d]" this leave for those in her "situation[.]" *Id.* § 2612(d)(2)(B). But Kramer testified that the guide-dog training did not fall within "the definition of sick leave" in the Ohio Revised Code, the collective-bargaining agreement, or the school board's sick-leave policy. Kramer Dep., R.21-1, PageID 422. The district court thus held that Tumbleson did not qualify for paid leave under the FMLA because she did not qualify for it under Lakota's sick-leave policy. *See Tumbleson*, 2025 WL 1797094, at *10–11.

What does the FMLA mean when it says that it does not "require an employer to provide paid sick leave . . . in any situation in which such employer would not *normally* provide any such paid leave"? 29 U.S.C. § 2612(d)(2)(B) (emphasis added). We can see two competing understandings. On the one hand, the district court read the phrase to give federal courts the power to second guess an employer's interpretation of its own sick-leave policy as a matter of federal law. *See Tumbleson*, 2025 WL 1797094, at *9. And a regulation does say that "[a]n employee's ability to substitute accrued paid leave is determined by the terms and conditions of the employer's normal leave policy." 29 C.F.R. § 825.207(a). On the other hand, one might read this language as imposing an antidiscrimination command that requires employers to follow their "usual" view of their sick-leave policies. 10 Oxford English Dictionary, *supra*, at 517 (defining "normally"). The regulation elsewhere might support this reading because it says that "[e]mployers may not discriminate against employees on FMLA leave in the administration of their paid leave policies." 29 C.F.R. § 825.207(a). And if the employees believe that this usual

view violates the sick-leave policy's plain terms, they should sue under state contract law rather than the FMLA.

Tumbleson's briefing allows us to avoid this question too. We will assume that the FMLA adopts the district court's understanding that federal courts may reexamine the terms of Lakota's sick-leave policy. That policy incorporates Ohio law and the collective-bargaining agreement by allowing teachers to "use sick leave for absence due to *personal illness*[.]" Ohio Rev. Code § 3319.141 (emphasis added); Agreement, R.22-1, PageID 502; Policy, R.22-1, PageID 507. The district court reasoned that "attending service dog training" "falls outside any range of a reasonable interpretation" of the phrase "personal illness." *Tumbleson*, 2025 WL 1797094, at *11. On appeal, Tumbleson's lawyer offered the following two sentences as her response to the court's logic:

> [T]he District Court fails to note that Lakota's sick leave policy and the collective bargaining agreement contain no definition of personal illness and nowhere clarify whether a significant medical condition is necessarily and substantively distinguishable from a personal illness. In this sense, Ms. Tumbleson's request for paid sick leave on account of her serious medical condition was not inconsistent with or substantively different from Lakota's normal leave policy.

Appellant's Br. 26–27.

This difficult-to-decipher claim lacks merit. Contrary to Tumbleson's argument, the district court did not overlook that the sick-leave policy lacked a definition of "personal illness." The court relied on Ohio contract law to presume that this undefined phrase took its ordinary unambiguous meaning. *Tumbleson*, 2025 WL 1797094, at *10–11 & n.7 (citing *Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 248 N.E.3d 196, 200–01 (Ohio 2024)). The court also recognized that Usher syndrome "*could* qualify as a 'personal illness'" that allowed Tumbleson to take sick leave if her symptoms made her unable to work. *See id.* at *11. But it thought that the "indirect connection" between her absence and her disease did not suffice to make the training a "personal illness." *Id.* Nothing in Tumbleson's two sentences of analysis calls this reasoning into doubt.

Yet we end with one final disclaimer: the parties did overlook a different phrase in the sick-leave policy. That policy allowed Tumbleson to use sick leave "for absence *due to* personal illness[.]" Policy, R.22-1, PageID 507 (emphasis added). The prepositional phrase "due to"

means "[b]ecause of." *American Heritage Dictionary* 553 (5th ed. 2018). So like "because of," this phrase may well incorporate the causation rules that we have discussed. *Cf. Nassar*, 570 U.S. at 350. We could see a claim that Tumbleson's Usher syndrome (a personal illness) qualified as the "but for" cause of her absence because she undertook the training due to her disease. *Id.* at 347. But Tumbleson forfeited this theory by failing to raise it. *See Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 886 (6th Cir. 2024). She thus did not give Lakota any opportunity to respond. And under the party-presentation principle, we cannot raise the argument on our own initiative. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Yet we flag the argument so future parties do not read this opinion as impliedly resolving it.

We affirm.